Christopher B. Healy, Esquire, (NJ Bar No. 013212005)
Bathgate, Wegener & Wolf, P.C.
One Airport Road
P.O. Box 2043
Lakewood, New Jersey 08701
Phone: 732-363-0666
Email: chealy@bathweg.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**Case No. _____**

MUFTI QUARASHI on behalf of
himself and all others similarly
situated,

      Plaintiff,

                                      **CLASS ACTION**
v.                                **JURY DEMAND**

M&T BANK CORP. and
AMERICAN SECURITY INSURANCE
COMPANY,

      Defendants.
_____/

**CLASS ACTION COMPLAINT**

    Plaintiff Mufti Quarashi files this class action complaint on behalf of himself and all others similarly situated against M&T BANK CORP. ("M&T"), and AMERICAN SECURITY INSURANCE COMPANY ("ASIC").

**INTRODUCTION**

    1.    Undersigned Counsel have been litigating force-placed insurance ("FPI") class actions against insurance company Assurant and its subsidiaries (here, Defendant ASIC) for

more than six years in the Southern District of Florida and District of New Jersey.  These FPI cases have been the subject of two different Multi District Litigation Panel ("MDL") hearings and have included the discovery of thousands of pages of documents and dozens of depositions. In early 2011, Undersigned Counsel filed the first of this wave of FPI cases in the Southern District of Florida, *Williams v. Wells Fargo Bank, N.A.,* No. 11-cv-21233-RNS (S.D. Fla.).  The *Williams* case was certified, eventually settled and was granted final approval on September 11, 2013.

2.      Undersigned Counsel subsequently filed additional nationwide class actions and have been appointed Co-Lead Counsel in the Southern District of Florida[1] and in the District of New Jersey[2] against many of the major mortgage lenders and servicers and their partner insurers.

[1] Undersigned counsel have been appointed co-lead counsel and final approval was granted in the settlements for the following force-placed insurance cases in the Southern District of Florida: *Saccoccio v. JPMorgan Chase Bank N.A.,* No. 13-cv-21107 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.,* No. 13-cv-21104 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.,* No. 13-cv-60721 (S.D. Fla.); *Hamilton v. SunTrust Mortg., Inc.,* No. 13-cv-60749 (S.D. Fla.); *Hall v. Bank of Am., N.A.,* No. 12-cv-22700 (S.D. Fla.); *Lee v. Ocwen Loan Servicing, LLC,* No. 14-cv-60649 (S.D. Fla.); *Braynen v. Nationstar Mortg., LLC,* No. 14-cv-20726 (S.D. Fla.); *Wilson v. Everbank, N.A.,* No. 14-cv-22264 (S.D. Fla.); *Montoya v. PNC Bank, N.A.,* No. 14-cv-20474 (S.D. Fla.); *Almanzar v. Select Portfolio Servicing,* No. 14-cv-22586 (S.D. Fla.); *Jackson v. U.S. Bank, N.A.,* No. 14-cv-21252 (S.D. Fla.); *Circeo-Loudon v. Green Tree Servicing, LLC,* No. 14-cv-21384 (S.D. Fla.); *Beber v. Branch Banking & Trust Co.,* No. 15-cv-23294 (S.D. Fla.); *Ziwczyn v. Regions Bank,* No. 15-cv-24558 (S.D. Fla.); *McNeil v. Loancare, LLC,* No. 16-cv-20830 (S.D. Fla.); *Edwards v. Seterus, Inc.,* No. 15-cv-23107 (S.D. Fla.) *Cooper v. PennyMac Loan Servicing, LLC*, No. 16-cv-20413 (S.D. Fla.).  In addition, preliminary approval has been granted in *McNeil v. Selene Finance, LP,* No. 16-cv-22930 (S.D. Fla.) and *Strickland v. Carrington, et al*. No. 16-cv-25237 (S.D. Fla.).

[2] Undersigned counsel were also appointed co-lead counsel, and final approval was recently granted, in *Gallo v. PHH Mortgage*, No. 12-cv-01117 in the District of New Jersey.  Counsel have also been actively litigating force-placed cases in the District of New Jersey.  In addition to this and the three other related cases that are being filed pursuant to the Order in *Quarashi v. Caliber Home Loans*, No. 16-cv-09245 (D.E. 91), undersigned counsel litigated the matter in *Bowles v. Fay Servicing*, No. 16-cv-02714 (D.N.J.) (ultimately settled as part of the *Strickland* matter) and have recently filed a nationwide action against Champion Mortgage and its force-placed providers. *See Leo v. Champion Mortgage*, No. 17-cv-05839.

2

These cases were very actively litigated and Undersigned Counsel have now reached nationwide settlements in most of those cases certifying nationwide classes and providing more than $5.2 billion in monetary relief to over 4.7 million homeowners across the country, plus important injunctive relief which has helped to put an end to most of the alleged unlawful practices for at least five years.

3.      Defendants' main defense in nearly every one of the cases has been that the filed-rate doctrine acts as a complete ban to all of plaintiffs' causes of action.  However, this argument has been expressly rejected by the Third Circuit and the district courts in the circuit.[3]  This case is brought mainly to recoup monetary damages that was suffered by the customers of M&T, which worked exclusively with Assurant's subsidiary ASIC to impose illegal and undisclosed charges on Plaintiff and the proposed class during the relevant time periods.

## PARTIES

**Plaintiff**

4.      Plaintiff Mufti Quarashi was charged for force-placed insurance by Defendant M&T.  Mr. Quarashi is a citizen of the State of New Jersey, residing at 1504 88th Street, North Bergen, New Jersey.  He is a natural person over the age of 21 and is otherwise *sui juris*.

**Defendants**

5.      Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant Inc., writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  ASIC often operates under the trade name "Assurant Specialty Property."   ASIC contracts with the

---

[3] *See e.g., Alston v. Countrywide Financial Corp.* (3d Cir. 2009); *Burroughs v. PHH Mortg. Corp.*, No. 15-cv-6122 (D.N.J.); *Xi Chen Lauren v. PNC Bank, N.A.*, No. 2:13-CV-762 (W.D.Pa.); *Gallo v. PHH Mortg. Corp.*, No. 12-cv-01117 (D.N.J.); *Weiss v. Bank of Am. Corp.*, No 15-cv-62 (W.D. Pa.); *Santos v. Carrington Mortg. Servs., LLC*, No. 2:15–cv–864 (D.N.J.); *DiGiacomo v. Statebridge Co., LLC*, No. 14-cv-6694 (D.N.J.).

10P1979

lenders to act as a force-placed insurance vendor and take over certain mortgage servicing functions.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, new loan boarding, loss draft functions, escrow analysis, handling customer service duties, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

6.      Defendant M&T BANK CORPORATION is a mortgage lender and servicer headquartered in Buffalo, New York, and doing business in numerous states, including New York, New Jersey, Pennsylvania, Maryland, Delaware, Virginia, West Virginia, Washington, D.C., and Connecticut.

## FACTUAL BACKGROUND

7.      Mortgage lenders and servicers, here M&T, have had arrangements with ASIC and its affiliates for many years whereby ASIC performs many of the lenders' and servicers' mortgage-servicing functions and is the exclusive provider of force-placed insurance coverage for homeowners.

8.      In exchange for providing ASIC with the exclusive right to monitor M&T's mortgage loan portfolio and force-place its own insurance coverage, ASIC pays M&T gratuitous kickbacks that are mischaracterized to borrowers as legitimate compensation. These kickbacks include, but are not limited to, one or more of the following: (1) unearned "commissions" paid to M&T or an affiliate for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse M&T for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) payments of illusory reinsurance premiums that carry no commensurate transfer of risk; and (4) free or below-cost mortgage-servicing functions that ASIC performs for M&T.  These kickbacks effectively constitute a rebate to M&T on the cost of the force-placed insurance that is not passed on to the borrowers.

10P1979

9. Despite representations to borrowers that they will only be charged for the cost of insurance coverage, and provisions in the mortgage contracts binding them to do so, M&T charges borrowers the cost of coverage plus the amount of the kickbacks; it does not, that is, pass these rebates on to the borrower. M&T deducts the initial, pre-rebate amount from borrowers' escrow accounts, and attempts to disguise the kickbacks as legitimate by mischaracterizing them as income earned.

10. These exclusive and collusive relationships have resulted in extraordinary profits for the Defendants totaling millions of dollars for M&T and ASIC.[4]  While many banks and insurance entities have ceased these practices as a result of class action lawsuits brought nationwide and various state and federal investigations, this class action has been brought to: (1) adequately compensate M&T homeowners for their economic losses, and (2) enjoin such practices by these Defendants in the future.

11. Lenders and servicers, like M&T here, force place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on the property that secures his or her loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" new coverage on the property to protect its interest and then charge the borrower the cost of coverage. The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and servicers in standard form mortgage agreements.

12. The money to finance force-placed insurance schemes comes from unsuspecting borrowers who are charged more than the cost of coverage for force-placed insurance by lenders

---

[4] These extraordinary profits are demonstrated by the extremely low loss ratios for the force-placed insurance product – typically in the range of 20-30%.  Loss ratios on homeowner's voluntary insurance is typically above 50%.

10P1979

or servicers.  Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer – here ASIC and affiliates – despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above.  Thus, M&T gets the benefit of an effective rebate from ASIC which it does not pass on to the borrower.  Instead, it charges the borrower the full amount, purportedly for the cost of insurance coverage.  M&T and ASIC reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

13.     At a hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[5]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                         August 9, 2012

14.     Assurant, Inc. which works through its subsidiaries, like ASIC, is one of the

---

[5] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_shearing_lender_placed_insurance_presentation_birnbaum.pdf.

10P1979

primary insurance company and controls the majority of the market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa[6], the other major insurer with a significant market share at that time, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks and other benefits.

### Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

15.    It is no surprise that these Defendants' practices have come under increased scrutiny by the government and regulators.  For example:

• On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower

_____

[6] In 2015, QBE sold its force-placed insurance business to National General Holdings Corp.

10P1979

rates."[7]   Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC and SGIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.   *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At the NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- The National Association of Insurance Commissioners (NAIC) also held hearings on force-placed insurance in August 2012 which included a discussion of "reverse competition" in the force-placed insurance market.  The NAIC's website explains:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.[8]

- The Consumer Financial Protection Bureau's new regulations on force-placed insurance became final on January 17, 2013 and prohibit

---

[7] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*,  Dep't  of  Fin.  Servs.,  Mar.  21,  2013,  *available  at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

8 *See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

10P1979

servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[9]

•       On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[10]

•       In 2016, Assurant entered into a settlement agreement with state regulators in accordance with a multistate market conduct examination. Among other things, Assurant and its subsidiaries are required to pay approximately $85 million to the participating jurisdictions and modify their FPI business practices.

16.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to Plaintiff and the proposed classes he seeks to represent.  This class action seeks to redress that harm on behalf of Plaintiff and the proposed Class members and to recover all improper charges they have incurred related to the forced placement of insurance by M&T and ASIC.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

18.      Plaintiff is a citizen of the State of New Jersey.  Defendants are citizens of various states but are registered to do business in New Jersey.  The amount in controversy

---

9 See Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/

[10] See https://www.fanniemae.com/content/announcement/svc1327.pdf

10P1979

exceeds $5,000,000 and there are at least one hundred members of the putative class.

19.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in New Jersey, are doing business in New Jersey, and have registered with the State of New Jersey, or do sufficient business in New Jersey, have sufficient minimum contacts with New Jersey, or otherwise intentionally avail themselves of the New Jersey consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in New Jersey.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

20.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

21.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiff Quarashi resided in the District of New Jersey and a substantial portion of the practices complained of herein occurred in the District of New Jersey.

22.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

23.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the coverage is neither a new concept nor a term undisclosed

10P1979

to borrowers in mortgage agreements.   The standard form mortgage agreements owned or serviced by M&T include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit M&T to obtain force-placed coverage and charge the borrower for the cost rather than declare the borrow in default.

24.     What is unknown to borrowers and not disclosed in the mortgage agreements is that M&T has exclusive arrangements with ASIC and its affiliates to manipulate the force-placed insurance market and charge borrowers more for FPI than permitted by the mortgage contract. M&T pays ASIC premiums for master group policies which cover its entire portfolio of mortgage loans, and the insurers then kick back a fixed percentage of the amount to M&T, providing them a rebate on the cost of coverage.   The kickbacks—which are entirely gratuitous and unearned—are disguised as "commissions," "qualified expense reimbursements," or ceded reinsurance premiums, and/or other unmerited charges.   M&T then charges borrowers the full, pre-rebate amounts, despite covenants in its mortgage agreements and representations in notices mailed to borrowers that they will be charged only the "cost of insurance coverage" for force-placed insurance.

### The Force-Placed Insurance Schemes

25.     ASIC has entered into exclusive arrangements with M&T to provide various mortgage servicing functions at below cost; mortgage servicing functions that are properly M&T's responsibilities and that M&T is paid to perform by the owners of loans.   ASIC also contracts to monitor M&T's mortgage loan portfolios and force-place insurance when an individual borrower's voluntary policy lapses, both obligations properly borne by M&T.   In

10P1979

addition to the subsidized mortgage services M&T receives from ASIC, a percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to M&T.

26.     The scheme works as follows.  M&T contracts for ASIC to take over various mortgage servicing functions and for a master insurance policy that covers its entire portfolio of mortgage loans.  In exchange, ASIC and its affiliates are given the exclusive right to be the sole force-placed insurance provider on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.

27.     ASIC and its affiliates monitor M&T's loan portfolios for lapses in borrowers' insurance coverage.  Once a lapse is identified, an automated cycle of notices, purporting to come from the lender or servicer but actually generated by ASIC, is sent to the borrowers to inform them that insurance will be purchased and force-placed if the voluntary coverage is not continued.  In reality, however, the master policy is already in place and the lender or servicer does not purchase a new policy on the individual borrower's behalf, rather, a certificate of insurance from the master policy is automatically issued by ASIC.  If a lapse continues, the borrower is notified that insurance is being force-placed at his or her expense.

28.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact.  Despite the absence of any claim or damage to the property during the period of lapse, coverage is placed on the property and the borrower is charged for the "cost" of the retroactive coverage.

29.     M&T then pays ASIC for the certificate of insurance, which issues from the

10P1979

already-existing master policy.  M&T, not the borrower, is obligated to pay ASIC for the force-placed insurance pursuant to the agreements between M&T and ASIC, which govern the mortgage servicing functions that ASIC performs as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

30.     Once coverage issues and M&T has paid ASIC the full amount invoiced, ASIC kicks back a set percentage of that amount to M&T without M&T performing any functions related to the placement of coverage or servicing of the borrower's loan.  The kickbacks paid to M&T or its affiliates are disguised as "commissions," "reinsurance payments," or "expense reimbursements."  Upon information and belief, any M&T affiliate that receives the kickback passes along that payment to M&T sometimes in the form of "soft dollar" or other similar credits.

31.     The payment is not compensation for work performed; it is an effective rebate on the premium amount, reducing the cost of coverage that M&T pays to ASIC.  The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by M&T or its affiliates related to the placement of the insurance; they are unlawful kickbacks to M&T for the exclusive arrangements to force-place insurance.

32.     The money paid back to M&T and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, ASIC, in letters purporting to come from M&T, will often disclose to the borrower that M&T or its affiliates may earn commissions or compensation as a result of the forced placement of new coverage.  In reality, however, no work is ever done by M&T or its affiliates to procure insurance for that particular borrower because

10P1979

the coverage comes through the master policy already in place – and the process is largely automated by ASIC.  As a result, no commission or compensation is "earned" and, in addition, neither M&T nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

33.    Once the certificate of insurance is issued on an individual borrower, M&T then charges that borrower the full, "pre-rebate" amount for the coverage while purporting to charge the borrower the cost of the insurance coverage in keeping with the borrower's mortgage agreement.  The inflated amount is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[11]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

34.    Under this highly profitable force-placed insurance scheme, M&T is incentivized to purchase and force-place insurance coverage with artificially inflated premiums on a borrower's property because the higher the cost of the insurance policy, the higher the kickback.  And, as a result of the kickbacks, M&T effectively pays a reduced amount for force-placed insurance coverage but does not to pass these savings on to its borrowers.

35.    ASIC and M&T also enter into agreements for ASIC to provide mortgage servicing activities on M&T's loan portfolio at below cost.  These activities include, but are not limited to, services such as new loan boarding, escrow administration, and loss draft functions – many of which have little or nothing to do with force-placed insurance.  ASIC offers to take on these mortgage servicing functions – which are M&T's responsibilities pursuant to its agreements with the owners of the loans – at a discount to maintain its exclusive right to force-

---

[11] On some occasions, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero.

place insurance on M&T borrowers.  Indeed, ASIC does not perform these services for a lender without also being the exclusive provider of force-placed insurance.

36.    The full cost of the servicing activities is added into the force-placed amounts which are then passed on to the borrower.  ASIC and its affiliates are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated amounts charged for force-placed insurance.  However, because insurance-lapsed mortgaged property typically comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from M&T unfairly bear the entire cost to service the entire loan portfolio – despite many of the services having nothing to do with force-placed insurance.  These charges, passed on to Plaintiff and the proposed Class members, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and M&T is already compensated for these activities by the owners of the loans (e.g., Fannie Mae).

37.    The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring M&T's loan portfolio, effectively resulting in a kickback.

38.    In addition, upon information and belief, ASIC enters into essentially riskless "captive reinsurance arrangements" with affiliates of M&T to "reinsure" the property insurance force-placed on borrowers.  A 2012 *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .
>
> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .

10P1979

Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

39.     M&T's reinsurance program is simply a way to funnel profits, in the form of ceded premiums, to M&T at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, M&T or its affiliates enter into reinsurance agreements with ASIC that provide that ASIC will return to M&T significant percentages of the force-placed insurance charges by way of ceded reinsurance premiums to M&T's affiliates or subsidiaries – which in turn pass on these profits to M&T.  The ceded premiums are nothing more than a kickback to M&T and a method for M&T to profit from the forced placement of new coverage.  Indeed, while M&T or its affiliates purportedly provided reinsurance, it did not assume any real risk.

40.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when M&T adds charges for force-placed insurance to a homeowners' mortgage loan balances, it increases the interest paid over the life of the loan by the homeowners to M&T.

41.     The actions and practices described above are unconscionable and undertaken in

16

10P1979

bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged more than M&T's cost of coverage for force-placed insurance.  These charges cover undisclosed kickbacks to M&T or its affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted mortgage servicing functions.

42.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies with premiums intended for all lender or servicer clients of ASIC, here M&T, and are meant to protect their interest in the property.[12]  The terms are determined by the lender or servicer and ASIC.

43.     Plaintiff here does not challenge M&T's right to force place insurance in the first instance.  He challenges Defendants' manipulation of the force-placed insurance market with an eye toward charging borrowers more for force-placed insurance than is authorized by their mortgage contracts and using unlawful kickback arrangements to cast the illegitimate excess charges as costs related to procuring coverage.  Lenders or servicers, like M&T, are financially motivated to select the insurer, like ASIC, that offer them the best financial benefit in the terms of "commissions," "expense reimbursements," discounted mortgage servicing functions, or ceded reinsurance premiums.

44.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements.  Plaintiff seeks to recover the improper charges passed on to him and other borrowers nationwide through his claims for breach of contract, breach of the implied

---

[12] Indeed, ASIC's master insurance policy is entitled "Mortgagee Interest Protection."

covenant of good faith and fair dealing, unjust enrichment, tortious interference with a contract or advantageous business relationship, and violations of the federal Truth in Lending Act ("TILA"), Racketeer Influenced and Corrupt Organizations Act ("RICO"), and New Jersey's consumer protection statute.

### Plaintiff Mufti Quarashi

45.     Plaintiff Mufti Quarashi took a mortgage on a property in North Bergen, New Jersey on June 19, 2006.  His mortgage loan, and all loan servicing obligation and liabilities related to the forced placement of insurance, was assigned to M&T Bank on June 20, 2012.

46.     Mr. Quarashi's mortgage contract included the following provisions regarding force-placed insurance:

> 5.     **Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance

18

that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

….

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

Mr. Quarashi's mortgage contract is attached as **Exhibit A**.

47.     M&T forced coverage on Mr. Quarashi's North Bergen property through ASIC in 2014.

48.     Plaintiff Quarashi received notices on M&T letterhead advising that his coverage had lapsed and that new coverage would be forced if the lapse was not cured.  The notices represented that the amounts charged for coverage covered the "cost of the insurance" or the "premiums that [M&T] pays," but did not disclose that Plaintiff Quarashi would be charged more than M&T's cost of insurance coverage or the post-rebate amount of the premium.  Letters such as these were sent to Mr. Quarashi on March 15, 2014, April 29, 2014, May 23, 2014, January 26, 2015, and March 23, 2015.

49.     At no time did any Defendants disclose, by any means, to Plaintiff Quarashi that an exclusive relationship between M&T and ASIC was already in place.  Nor was there any disclosure of the financial arrangement between the Defendants to keep the exclusive force-placed relationship in place.

50.     Nor was it disclosed to Plaintiff Quarashi or the putative Class members that because of this kickback, M&T itself would effectively be paying a less than what it would charge to Plaintiff Quarashi for the force-placed insurance coverage.

51.     Finally, it was never disclosed to Plaintiff Quarashi or the Class members that the amounts charged them covered other illegitimate kickbacks and below cost mortgage-servicing functions not properly charged to them. The amounts kicked back to M&T were not reduced from the amount charged resulting in Plaintiff Quarashi paying more than the "cost" of the insurance.

52.     All putative Class members received materially similar letters pursuant to the automated procedures used by Defendants.

53.     There are no material differences between these Defendants' actions and practices directed to Plaintiff Quarashi and their actions and practices directed to the putative Classes.

## CLASS ALLEGATIONS

### A.     Class Definitions

54.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated. Plaintiff seeks to represent the following classes:

M&T Nationwide Class:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed insurance policy through M&T or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

New Jersey Subclass:

> All New Jersey borrowers who, within the applicable statutes of

20

limitation, were charged for a force-placed insurance policy through M&T or its affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

55.     Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

56.     Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.**     **Numerosity**

57.     The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in New Jersey as well as nationwide.  The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by Defendants.  The precise number of Class members for the classes numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**C.**     **Commonality**

58.     There are questions of law and fact that are common to Plaintiff's and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

  a.  Whether M&T charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages;

b. Whether M&T breached its mortgage contracts with Plaintiff and the Class members by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiff and the Class members for servicing its loans;

c. Whether M&T has been unjustly enriched at the expense of Plaintiff and the Class members;

d. Whether M&T breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with ASIC and/or its affiliates, which resulted in amounts above the cost of coverage for force-placed insurance being charged to Plaintiff and the Class members as kickbacks;

e. Whether Defendants manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiff and the Class members;

f. Whether M&T, or its affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

g. Whether "qualified expense reimbursements" received by M&T are for true expenses or are just kickbacks pursuant to its exclusive relationship with ASIC;

h. Whether M&T charges Plaintiff and the Class members amounts beyond the cost of coverage and takes kickbacks from ASIC that are disguised as "commissions" and "qualified expense reimbursements," among other things;

i. Whether M&T violated the federal Truth in Lending Act ("TILA") by conditioning its extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

j. Whether M&T violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class members in its mortgages;

k. Whether ASIC intentionally and unjustifiably interfered with Plaintiff's and the Class members' rights under the mortgage contracts by paying kickbacks and providing free or below-cost mortgage servicing functions to M&T or its affiliates thereby inducing a breach of the contract;

l. Whether Defendants were associated with the enterprise and agreed and conspired to violate the federal RICO statutes; and

m. Whether Plaintiff and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

10P1979

D.      **Typicality**

59.     Plaintiff is a member of the classes he seeks to represent.  Plaintiff's claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

E.      **Adequacy of Representation**

60.     Plaintiff is an adequate representative of the classes he seeks to represent and will fairly and adequately protect the interests of those classes.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him.   There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

61.     To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F.      **Requirements of Fed. R. Civ. P. 23(b)(3)**

62.     The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiff and the unnamed Class members are based on Defendants' scheme regarding the force-placed insurance policies and their deceptive and egregious actions involved in securing the force-placed policy.

63.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

64.     As a result, when determining whether common questions predominate, courts

10P1979

focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.**     **Superiority**

65.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)     Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)     Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)     There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)     The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)     Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)     The action is manageable as a class action.

**H.**     **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

66.     Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

67.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**COUNT I**

10P1979

## BREACH OF CONTRACT
## (against M&T)

68.     Plaintiff Quarashi re-alleges and incorporates the paragraphs alleged above as if fully set forth herein and further alleges as follows.

69.     Plaintiff Quarashi and all similarly situated Class members have mortgages that are owned and/or serviced by M&T.

70.     Plaintiff Quarashi and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by M&T.  The force-placed provisions from Plaintiff Quarashi's mortgage are set forth above in paragraph 46.

71.     Plaintiff Quarashi's mortgage requires that he maintain insurance on his property and provides that if he fails to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

72.     M&T charges borrowers amounts for force-placed insurance that include unmerited "qualified expense reimbursements" or "commissions," reinsurance payments, as well as discounted mortgage servicing functions, and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting M&T's rights or risk in the collateral for borrowers' mortgage loans.  M&T breached the mortgage agreements by, among other things, charging Plaintiff Quarashi and Class members the amounts beyond the actual cost of coverage.

73.     M&T has also breached Plaintiff's and the Class members' mortgage agreements by charging Plaintiff Quarashi and the Class members for excess and unnecessary force-placed insurance coverage, as such coverage does not protect M&T's rights in its collateral or cover its risk.

74.     Plaintiff Quarashi and the Class members have suffered damages as a result of

10P1979

M&T's breaches of their contracts.

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and all similarly situated class members, seeks compensatory damages resulting from the M&T's breaches of contract, as well as injunctive relief preventing them from further violating the terms of the Class members' mortgages. Plaintiff Quarashi further seeks all relief deemed appropriate by this Court, including pre- and post-judgment interest, attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against M&T)

75.     Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

76.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

77.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

78.     Plaintiff Quarashi's and the Class members' mortgage contracts allow M&T to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

79.     M&T is afforded substantial discretion in force-placing insurance coverage. It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiates any price for the coverage it procures. M&T has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith. Plaintiff Quarashi does

10P1979

not seek to vary the express terms of the mortgage contract, but only to insure that M&T exercises its discretion in good faith.

80.     M&T breached the implied covenant of good faith and fair dealing by, among other things:

(a)     Manipulating the force-placed insurance market by selecting insurers (here, ASIC and its affiliates) that will participate in its kickback scheme, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby an exclusive arrangement is in place for ASIC to issue its own insurance coverage without M&T seeking a competitive price;

(b)     Exercising its discretion to choose a force-placed coverage in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting coverage from insurers that will participate in a scheme to charge borrowers amounts beyond the cost of coverage;

(c)     Assessing inflated and unnecessary insurance charges against Plaintiff Quarashi and the Class and misrepresenting the reason for the cost of the policies;

(d)     Collecting a percentage of the amounts charged to borrowers and not passing that rebate on to the borrower;

(e)     Charging Plaintiff Quarashi and the Class the cost of having the vendor perform its obligation of servicing its mortgage portfolio, which is not properly chargeable to Plaintiff Quarashi or the Class;

(f)     Charging Plaintiff Quarashi and the Class for expense reimbursements or commissions when the insurance is prearranged, no work is done by M&T or its affiliates, no expenses related to the placement of the force-placed insurance are incurred, and no commission is due; and

(h)     Charging Plaintiff Quarashi and the Class illegitimate amounts for force-placed insurance due to the captive reinsurance arrangement.

81.      As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff Quarashi and the Class have suffered damages.

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and similarly situated Class members, seeks a judicial declaration that the amounts charged and the terms of the force-placed

10P1979

insurance policies violate the duties of good faith and fair dealing. Plaintiff Quarashi also seeks damages resulting from the M&T's breaches of its duties. Plaintiff Quarashi further seeks all relief deemed appropriate by this Court, including pre- and post-judgment interest, attorneys' fees and costs.

## COUNT III

## UNJUST ENRICHMENT
## (against M&T)[13]

82.    Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

83.    M&T received from Plaintiff Quarashi and Class members, benefits in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and subsidized loan servicing costs.

84.    M&T entered into an agreement whereby the insurance vendor – here, ASIC and its affiliates – would provide below cost mortgage servicing activities and cover M&T's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed. M&T would then charge Plaintiff Quarashi and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself. The force-placed policies imposed on borrowers therefore cost less than what SLS actually paid for them.

85.    ASIC paid M&T significant monies in kickbacks, commissions, reimbursements, and reinsurance tied to the cost of the force-placed insurance premium (as a percentage). The payments reduced the amount that M&T actually paid for the force-placed policies, however, the amount charged to Plaintiff and Class members was not reduced by that amount resulting in an

---

[13] Plaintiff Quarashi pleads his unjust enrichment claim against M&T in the alternative to his contractual claims.

10P1979

improper benefit to M&T at the borrowers' expense.  ASIC and its affiliates acted as mere conduits for the delivery of the kickbacks and improper charges to M&T or its affiliates.

86.     These payments directly benefitted M&T and/or its affiliates and were taken to the detriment of the borrower.  The kickbacks (in the form reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.  Therefore, M&T had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.  ASIC acted as a mere conduit for these benefits to M&T.

87.     Further, M&T was unjustly enriched through financial benefits in the form of increased interest income and other fees that resulted when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans.

88.      As a result, Plaintiff Quarashi and the Class members have conferred a benefit on M&T.

89.      M&T had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

90.      Had Plaintiff Quarashi known that he had been charged amounts in excess of M&T's cost of coverage, he would have expected remuneration from M&T at the time the benefit was conferred.

91.      M&T will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which M&T was unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and all similarly situated Class members, demands an award against M&T in the amounts by which it has been unjustly enriched

10P1979

at Plaintiff Quarashi's and the Class members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (against M&T)

92.     Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

93.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

94.     M&T has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey.  M&T has an exclusive relationship with ASIC, whereby it would pay for high-priced force-placed insurance and charge that amount to Plaintiff and the New Jersey Subclass, in order to receive improper compensation through illegal kickbacks in the form of "commissions," "expense reimbursements," or captive reinsurance arrangements based on a percentage of the insurance policy's premium, that is paid to M&T or its affiliates.  M&T further received below-cost mortgage servicing functions from ASIC as an incentive to maintain the exclusive relationship.

95.     It was an unconscionable commercial practice for M&T to accept kickbacks from

10P1979

AISC for selecting its insurance.  A New Jersey statute expressly bans M&T and ASIC's conduct in paying, accepting and/or allowing the kickbacks identified in this lawsuit.  It states:

> no insurer . . . shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent that such rebate, discount, abatement, credit, reduction, favor, advantage, or consideration may be provided for in rating–systems filed by or on behalf of such insurer and approved by the commissioner.  No insured named in a policy of insurance . . . shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, or reduction of premium, or any such special favor or advantage or valuable consideration or inducement.

N.J.S.A. 17:29A-15.

96.     M&T also made numerous misrepresentations and deceptive statements in carrying out Defendants' scheme to defraud Plaintiff Quarashi and the New Jersey Subclass. ASIC, with the approval of M&T, sent form letters to Plaintiff Quarashi on M&T letterhead, stating that M&T would purchase or renew force-placed coverage if voluntary insurance was not secured.  In the Defendants' letter to Quarashi and the New Jersey Subclass, Defendants state that that M&T would charge Plaintiff and the Subclass for the "cost of the insurance" and that this cost would be higher because the insurance is "issued automatically without evaluating the risk of insuring your property."

97.     Defendants' statements were false and misleading because Plaintiff Quarashi and Class members were not charged the actual amount that M&T paid and the monthly mortgage balances would not be increased by the cost of the insurance.  Instead, M&T imposed charges on Plaintiff and the New Jersey Subclass that were beyond the cost of insurance coverage and the amount charged was higher because it included the unlawful kickbacks and subsidies for the mortgage servicing functions performed by ASIC.  Plaintiff Quarashi's monthly mortgage

31

10P1979

payments were increased not by the "cost" of the insurance, but by the cost of insurance plus additional amounts unrelated to force-placed insurance coverage, including kickbacks, reinsurance profits, and other wrongful benefits ASIC conveyed to M&T.  Letters containing these misrepresentations, deceptive statements, and false pretenses were sent to Mr. Quarashi on March 15, 2014, April 29, 2014, May 23, 2014, January 26, 2015, and March 23, 2015.

98.    Defendants also deceived and misrepresented to Plaintiff Quarashi and the New Jersey Subclass in making these statements and creating the impression that they were being charged for the cost of insurance coverage.  In fact, they were being charged more because M&T had selected ASIC insurance policies to obtain kickbacks and other wrongful benefits that amounted to a rebate on the cost of the insurance to M&T that was not passed on to the borrower.

99.    Further, the policy that was "purchased" according to these letters, was actually already in place on the date of lapse according to the agreement between ASIC and M&T.

100.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction.  N.J.S.A. 56:8-19.

101.    Plaintiff Quarashi and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

102.    Plaintiff Quarashi and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the M&T's unconscionable practices.  M&T had an exclusive relationship with ASIC, whereby M&T agreed to select the ASIC force-placed insurance policies which carried exorbitant premiums, which M&T paid, and

32

10P1979

then imposed charges in excess of the cost of coverage on Plaintiff and the New Jersey Subclass. M&T made this selection because ASIC would kick back a set percentage of the inflated premiums to M&T or its affiliates or enter into other arrangements that would deliver illicit financial benefits to M&T. Pursuant to the terms of the standard form mortgage agreements used by M&T, it would purchase the required coverage and charge the Plaintiff and New Jersey Subclass's escrow accounts for the cost of the insurance. But, as part of the scheme by Defendants, M&T charged Plaintiff and the New Jersey Subclass more than its cost of coverage.

103.   Plaintiff Quarashi and the New Jersey Subclass have a private right of action against M&T and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

104.   Plaintiff Quarashi and the New Jersey Subclass have suffered, and will continue to suffer, irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and the New Jersey Subclass, demands judgment against M&T for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT V

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (against ASIC)

105.   Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

106.   The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use

10P1979

or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

107.    ASIC has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey.  ASIC had a relationship with M&T, whereby ASIC incentivized M&T to select ASIC's force-placed insurance policies with knowledge that the full, pre-rebate amount would be charged by M&T to Plaintiff and the New Jersey Subclass.  As compensation, ASIC would kick back a set percentage of the force-placed charge to M&T or its affiliates as a commission or an expense reimbursement or enter into captive reinsurance agreements with M&T affiliates as a means to funnel financial benefits to them.

108.    It was an unconscionable commercial practice for ASIC to pay kickbacks to M&T for selecting the ASIC insurance.  A New Jersey statute expressly bans ASIC's conduct in paying and/or allowing the kickbacks identified in this lawsuit.  It states:

> no insurer . . . shall pay, allow, or give, or offered to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent that such rebate, discount, abatement, credit, reduction, favor, advantage, or consideration may be provided for in rating–systems filed by or on behalf of such insurer and approved by the commissioner.  No insured named in a policy of insurance . . . shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, or reduction of premium, or any such special favor or advantage or valuable consideration or inducement.

N.J.S.A. 17:29A-15.

109.    ASIC made numerous misrepresentations in carrying out Defendants' scheme to defraud Plaintiff Quarashi and the New Jersey Subclass.  ASIC, with the approval of M&T, sent form letters to Plaintiff on M&T letterhead, stating that M&T would purchase or renew force-placed coverage if voluntary insurance was not secured.  In the Defendants' letter to Quarashi and the New Jersey Subclass, Defendants state that that M&T would charge Plaintiff and the Subclass for the "cost of the insurance" and that this cost would be higher because the insurance is "issued automatically without evaluating the risk of insuring your property."

110.    Defendants' statements were false and misleading because Plaintiff Quarashi and Class members were not charged the amount that M&T ultimately paid and the mortgage balance would not be increased by the cost of the insurance.  Instead, M&T imposed charges on Plaintiff and the New Jersey Subclass beyond the cost of coverage, which were disguised as "commissions" and other costs.  In addition, the monthly payments were increased not by the "cost" of the insurance, but by the cost of the insurance *plus* the amount kicked back to M&T.  Letters containing these misrepresentations, deceptive statements, and false pretenses were sent to Mr. Quarashi on March 15, 2014, April 29, 2014, May 23, 2014, January 26, 2015, and March 23, 2015.

111.    Defendants also deceived and misrepresented to Plaintiff Quarashi and the New Jersey Subclass in making these statements and creating the impression that they were being charged for the cost of the insurance coverage.  In fact, they were being charged an amount much greater than the actual cost of the insurance, and much more than their voluntary coverage, because M&T had selected ASIC insurance policies to obtain kickbacks and other wrongful benefits ASIC paid to M&T.

10P1979

112.    Further, the policy that was "purchased" according to these letters, was actually already in place on the date of lapse according to the agreement between ASIC and M&T.

113.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

114.    Plaintiff Quarashi and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

115.    Plaintiff and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the ASIC's unfair and unconscionable practices.  M&T had an exclusive relationship with ASIC, whereby M&T agreed to select the ASIC force-placed insurance policies that carried amounts beyond the cost of coverage and charge the pre-rebate amount to Plaintiff Quarashi and the New Jersey Subclass.  M&T made this selection because ASIC would kick back a set percentage of the premiums to M&T or its affiliates, or enter into other arrangements that would deliver illicit financial benefits to M&T.  Pursuant to the terms of the standard form mortgage agreements used by M&T, it would purchase the required hazard coverage and charge the Plaintiff and New Jersey Subclass's escrow accounts for the cost of the insurance.  As part of the scheme by Defendants, M&T charged Plaintiff Quarashi and the New Jersey Subclass more than the cost of insurance.

116.    Plaintiff and the New Jersey Subclass have a private right of action against ASIC and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

36

117.    Plaintiff and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

WHEREFORE, Plaintiff Quarashi, on behalf of himself and the New Jersey Subclass, demands judgment against ASIC for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**
**(against ASIC)**

118.    Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows

119.    Plaintiff Quarashi and the Class members have advantageous business and contractual relationships with M&T pursuant to the mortgage contracts.  Plaintiff Quarashi and the Class members have legal rights under these mortgage contracts.  For example, Plaintiff Quarashi and the Class members have a right not to be charged exorbitant charges in bad faith for forced-place insurance.

120.    ASIC has knowledge of the mortgage contracts and the advantageous business and contractual relationships between the Plaintiff and the Class members and M&T.  ASIC is not a party to the mortgage contracts, nor is it a third-party beneficiary of the mortgage contracts.  Further, ASIC does not have any beneficial or economic interest in the mortgage contracts.

121.    ASIC, in bad faith and with the intent to maximize the Defendants' profits, intentionally and unjustifiably interfered with Plaintiff Quarashi's and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship

37

10P1979

with M&T and its affiliates, whereby it provide kickbacks (in the form of unmerited expense reimbursements or commissions, or reinsurance premiums without the corresponding risk, as well as below cost mortgage servicing) to M&T in exchange for the exclusive right to force-place insurance on borrowers' properties.

122.    Plaintiff Quarashi and the Class members have been damaged as a result of ASIC's interference with their mortgage contracts by being charged unauthorized and illegitimate amounts for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and all Class members similarly situated, seeks a judgment against ASIC for the actual damages suffered by him and the Class as a result of ASIC' tortious interference.  Plaintiff Quarashi also seeks all costs of litigating this action, including attorneys' fees.

## COUNT VII

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
## (against M&T)

123.    Plaintiff Quarashi re-alleges and incorporates the paragraphs alleged above as if fully set forth herein and further alleges as follows.

124.    Plaintiff Quarashi's and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

125.    M&T is a "creditor" as defined by TILA because it owned and/or serviced Plaintiff's mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which M&T was the creditor.

38

126.     Pursuant to TILA, M&T was required to accurately and fully disclose the terms of the legal obligations between the parties.  See 12 C.F.R. § 226.17(c).

127.     M&T violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff Quarashi's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickbacks, reinsurance, discount mortgage servicing, and other profiteering involving M&T and/or its affiliates as a result of the purchase of force-placed insurance.

128.     When M&T changed the terms of Plaintiff Quarashi's mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, M&T was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof.  On information and belief, M&T increased the principal amount under Plaintiff Quarashi's mortgage when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

129.     M&T adversely changed the terms of Plaintiff Quarashi's loan after origination in order to allow a kickback on the force-placed insurance charges.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  M&T never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to it or its affiliate.

130.     M&T also violated TILA by adversely changing the terms of Plaintiff Quarashi's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages.

39

131.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because M&T's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

132.    Plaintiff Quarashi and Class members have been injured and have suffered a monetary loss arising from M&T's violations of TILA.

133.    As a result of M&T's TILA violations, Plaintiff Quarashi and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of M&T's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

134.    Plaintiff Quarashi and Class members are also entitled to recovery of attorneys' fees and costs to be paid by M&T, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiff Quarashi, on behalf of himself and all Class members similarly situated, seeks a judgment against M&T awarding actual damages and a penalty of $500,000.00 or 1% of M&T's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by M&T, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VIII

### Violation of RICO, 18 U.S.C. § 1962(c)
### (Plaintiff Quarashi against M&T and ASIC)

135.    Plaintiff Quarashi re-alleges and incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

136.    At all relevant times, M&T and ASIC were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

40

137.    The RICO enterprise, which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included M&T, its affiliates, and ASIC and its affiliates.

138.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiff Quarashi and Class members to overpay amounts for force-placed insurance through a scheme that allowed Defendants to charge borrowers more than M&T's cost of coverage using kickbacks and expenses associated with servicing M&T's entire loan portfolio to conceal from Plaintiff Quarashi and Class members the true nature of the charges.   M&T and ASIC shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

139.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

140.    M&T and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

141.    M&T and ASIC directed and controlled the enterprise as follows:

a.    ASIC specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which the M&T agreed;

b.    ASIC drafted the language of the fraudulent letters and correspondence to

41

10P1979

borrowers that was specifically designed to deceive borrowers into believing that they were coming from the M&T.  The letters fraudulently misrepresented the true nature of the "cost" of the insurance forced on their properties, and these letters were approved by the M&T;

c. ASIC ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking M&T's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a M&T affiliate would be paid as compensation for work performed;

d. ASIC paid kickbacks to M&T and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

e. by directing, controlling, and creating an enterprise and arrangement by which M&T would receive unearned kickbacks;

f. by directing, controlling, and creating an enterprise and arrangement by which M&T would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, debt forgiveness, expense reimbursements, or "commissions," that were merely bribes to keep the exclusive relationship in place and not disclosing same to borrowers;

g. by directing, controlling, and creating an enterprise and program by which M&T never charged the borrowers its actual or effective cost of the force-placed insurance policies;

h. by directing, controlling, and creating an enterprise and program where ASIC took money directly from borrowers' escrow accounts and took amounts which

42

are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks;

i.  by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance.  The charges were inflated to provide the M&T and its affiliates with kickbacks disguised as "commissions" or "expense reimbursements," or to cover the cost of discounted mortgage servicing, and/or to provide the M&T with other forms of kickbacks.  ASIC and its affiliates benefit by securing business from the M&T—it provides kickbacks to M&T at the expense of the borrowers who are charged the inflated charges;

j.  by developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made or resulted in "double coverage;" and

k.  by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

142.   In order to further their control and direction of the enterprise, ASIC paid kickbacks to M&T in the form of unearned commissions, direct payments, reinsurance premiums, expense reimbursements, and below-cost mortgage servicing functions.

10P1979

143.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff Quarashi and Class members with the intent to defraud and deceive them.

144.    For example, ASIC, with the approval of the M&T, sent form letters to Plaintiff Quarashi on M&T letterhead through the U.S. mail, stating that M&T would purchase force-placed coverage if voluntary insurance was not secured by a certain date.   These Defendants represented in the letters that M&T would purchase the required coverage and charge the borrower the "cost of the insurance" or the "premiums that [M&T] pays."   In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiff Quarashi was charged represented the actual cost of the insurance premiums, when in fact such amounts also included kickbacks and other costs paid as bribes to the M&T, and Plaintiff Quarashi was charged significantly more than M&T had paid for coverage.

145.    M&T and ASIC had a duty to correct this mistaken impression. These misrepresentations and omissions were material, as they helped these Defendants advance their scheme to charge Plaintiff Quarashi unreasonably high amounts for force-placed insurance and were designed to lull Plaintiff Quarashi and the Class into believing that the charges were legitimate.   Plaintiff Quarashi (and other homeowners) would not have paid, or would have contested these specific charges had M&T and ASIC disclosed that the illegal bribes and kickbacks were included and that these forced-charges did not represent simply the cost of the required insurance coverage.    For example, letters containing these misrepresentations and omissions were sent to Mr. Quarashi on March 15, 2014, April 29, 2014, May 23, 2014, January 26, 2015, and March 23, 2015s.

10P1979

146.    ASIC and its affiliates, with the approval of the M&T and on M&T letterhead, also sent Plaintiff Quarashi force-placed insurance notices through the U.S. mail informing them that force-placed insurance would cost more "because the insurance we purchase is issued automatically without evaluating the risk of insuring your property," when in fact, the inflated amounts charged to Plaintiff Quarashi and the class were due to kickbacks and other impermissible costs provided to M&T and included in the amounts charged Plaintiff Quarashi and the Class members.  M&T and ASIC had a duty to correct this mistaken impression.

147.    This misrepresentation was material, as it gave M&T and ASIC a colorable reason to charge Plaintiff Quarashi unreasonably inflated amounts for insurance and would have influenced Plaintiff Quarashi's decisions whether to pay the charges or contest them.  For example, had Plaintiff Quarashi known that M&T was effectively paying much less than what it charged to Plaintiff Quarashi; Plaintiff Quarashi would not have paid or would have contested the charges for force-placed insurance.  Plaintiff Quarashi received such letters dated January March 15, 2014, April 29, 2014, May 23, 2014, January 26, 2015, and March 23, 2015 through the U.S. mail.

148.    For the purpose of executing the scheme to defraud, M&T and ASIC sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff Quarashi and Class members that they could charge Plaintiff Quarashi and Class members unreasonably high amounts for force-placed insurance.

149.    This scheme to defraud proximately injured Plaintiff Quarashi and the Class members because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their

property.  Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them.  M&T and ASIC also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiff Quarashi and Class members, in violation of the wire fraud statutes.

150.    By reason and as a result of M&T's and ASIC's conduct and participation in the racketeering activity alleged herein, these Defendants have caused damages to Plaintiff Quarashi and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiff Quarashi and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT IX

### Violation of RICO, 18 U.S.C. § 1962(d)
### (Plaintiff Quarashi against M&T and ASIC)

151.    Plaintiff incorporates the paragraphs above as if fully set forth herein and further alleges as follows.

152.    At all relevant times, M&T and ASIC were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  These Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

153.    M&T and ASIC illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, inter *alia*:

    a.   Agreeing that ASIC and its affiliates would be M&T's exclusive force-placed insurance providers and would extract unreasonably inflated amounts from M&T's customers.  Defendants also agreed that ASIC would pay kickbacks to

46

M&T or its affiliates;

b.   Agreeing that ASIC would monitor M&T's mortgage portfolios for lapses in voluntary insurance and would, with the approval of M&T, send misleading notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a M&T affiliate;

c.   Entering into illusory commission or other agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

d.   Agreeing to commit two or more predicate acts as described above in Count XXVI.

154.   Upon information and belief, M&T affiliates pass profits from this scheme to M&T through credits in their general ledge accounts.

155.   M&T and ASIC committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

156.   As a result of these Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff Quarashi and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiff Quarashi and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## <u>PRAYER FOR RELIEF</u>

10P1979

Plaintiff Quarashi on behalf of himself and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and his counsel to be a representative of the Class;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiff and the Class members as a result of M&T's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that the M&T has been unjustly enriched and requiring these Defendants to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding actual damages and a penalty of $500,000 or 1% of M&T's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3)

(7)     Awarding actual and, where appropriate, punitive damages sustained by Plaintiff and the Class as a result of ASIC's tortious interference;

(8)     Awarding Plaintiff and the New Jersey Subclass compensatory and treble damages, injunctive relief, declaratory relief, attorneys' fees, and costs under NJCFA;

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

10P1979

(10)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 1st day of September, 2017.

By: /s/ Christopher B. Healy, Esq.

| | |
|---|---|
| Michael M. DiCicco, Esq.<br>Fed. ID# MD0316<br>mdicicco@bathweg.com<br>Christopher B. Healy, Esq.<br>NJ Bar # 013212005<br>chealy@bathweg.com<br>**Bathgate, Wegener & Wolf, P.C.**<br>One Airport Road<br>P.O. Box 2043<br>Lakewood, New Jersey 08701<br>Phone: 732-363-0666<br>*Counsel for Plaintiff* | Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiff*<br>(*pro hac vice* forthcoming) |
| Lance A. Harke, Esq.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, New Jersey 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiff*<br>(*pro hac vice* forthcoming) | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, New Jersey 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff*<br>(*pro hac vice* forthcoming) |

10P1979